# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00373-CV

### H. G., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

## FROM THE 424TH DISTRICT COURT OF BURNET COUNTY
## NO. 51641, THE HONORABLE FRANK E. GRIFFIN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

H.G. (Mother) appeals the trial court's order, rendered on a jury verdict, terminating her parental rights to her sons, T.W. (Older Son) and J.G. (Younger Son).  Mother challenges the trial court's admission of certain evidence and the legal and factual sufficiency of the evidence supporting the jury's statutory-predicate findings for termination and its best-interest findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2).  Because Mother's evidence-admission issues are either waived or unmeritorious and the evidence was legally and factually sufficient to support the jury's endangerment and best-interest findings about each child, we affirm the trial court's termination order.

## BACKGROUND

Older Son was born to Mother in late 2005 and was approaching 17 years old at the time of the 2022 jury trial.  Younger Son was born to Mother in summer 2017, making him nearly five years old at the time of trial.  Younger Son's father died soon after the child's birth.

After Department investigations of Mother's parenting in 2010 and 2015—each time involving drug abuse—in November 2020, a Department investigator went to Mother's home in Burnet County to investigate a report of neglectful supervision. Older Son had told a school counselor that he felt that Mother's live-in boyfriend (Boyfriend) had threatened him. Mother and Boyfriend had begun their romantic relationship just two months before the investigation began, and the month after they started dating, he moved in with Mother, Older Son, Younger Son, and Younger Son's two half-siblings by his deceased father. Boyfriend's three children lived in their grandmother's custody but would visit Mother's home often.

Because of Mother's Department history, the investigator asked to drug-test Mother. Mother agreed and admitted that she would test positive for methamphetamine because she had used it just two days before. Older Son and Younger Son were immediately removed from the home and, over the course of the case, would come to live in different placements—Older Son with his great-grandparents nearby and Younger Son with a great-uncle and his wife in Fort Worth.

The investigator turned the case over to a Department caseworker, who held an early-case conference with Mother and Boyfriend. The conference was to discuss Mother's Family Service Plan, which catalogued the services the Department required Mother to complete before it would return the children to her, including weekly drug-testing. Then, three months after the removal, the trial court ordered Mother to complete the requirements in her Plan.

The caseworker also told Mother and Boyfriend that if they were going to continue their romantic relationship, he would have to complete a Plan of his own before the children would be returned to Mother. Later after some drug-testing of Mother and Boyfriend, and some progress by Mother on her Plan, the two tested positive for methamphetamine. From then on, they refused to pursue any of the services required by their Plans.

2

With Mother ceasing progress on her Plan, and with the caseworker's and Older Son and Younger Son's therapist's approval, the Department prevented Mother from contacting the children until she began complying with her Plan again. Her phone calls with Older Son had grown contentious. Plus, though the Department required that the great-grandfather be involved with the phone calls, Mother tried to evade that requirement by arranging contact with Older Son through her father.

At trial, the Department presented exhibits and testimony from Mother; Boyfriend; Boyfriend's adult daughter, who testified about Boyfriend's domestic violence and other concerning behavior; the investigator; the caseworker; the children's therapist; the great-grandfather; the great-uncle; and a representative from Court Appointed Special Advocates (CASA). After the close of the evidence, Mother moved for a directed verdict on the statutory predicate grounds for termination that the Department would submit to the jury—Subsections (D), (E), and (O)—and the best-interest requirement. The court denied the motion; the jury returned a verdict in the Department's favor; and Mother moved for a new trial on the predicate and best-interest grounds, which was denied by operation of law. Mother now appeals the final order of termination that the trial court rendered on the jury's verdict.

## APPLICABLE LAW AND STANDARD OF REVIEW

To terminate parental rights, the Department must prove both one of the statutory predicate grounds and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements by clear and convincing evidence. *See* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree

of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

Legal-sufficiency review of the evidence to support termination requires reviewing all the evidence in the light most favorable to the finding under attack and considering undisputed contrary evidence to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

## ADMISSIONS OF EVIDENCE

In her first evidence-admission issue, Mother challenges the trial court's admission of Department's exhibits 15 and 16, regarding Boyfriend's criminal offenses. The exhibits include judgments of conviction, and evidence of successful discharge from community supervision, for Boyfriend's Class A misdemeanor for violating a protective order and his Class B misdemeanor for a terroristic threat. *See* Tex. Penal Code §§ 22.07 (terroristic threat), 25.07 (violation of protective order). On appeal, Mother argues that the exhibits should have been excluded under

4

Rule of Evidence 404 as evidence of a crime used improperly for a character-conformity purpose and under Rule of Evidence 609 as evidence of a conviction from over 10 years ago whose probative value does not outweigh its prejudicial effect. We review a trial court's ruling admitting evidence for an abuse of discretion and may not reverse unless the ruling lies outside the "zone of reasonable disagreement." *See Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018).

When the Department offered the exhibits, Mother's objections were that the exhibits were irrelevant, hearsay, improper impeachment, and "over ten years old." Mother did not object on Rule 404 grounds, the objections she did make did not raise Rule 404 or its substance, and a Rule 404 ground was not apparent from the context. Thus, she failed to preserve her Rule 404 argument for appeal. *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1)(A)–(B); *In re P.W.*, No. 02-21-00219-CV, 2021 WL 6068944, at *3 (Tex. App.—Fort Worth Dec. 23, 2021, no pet.) (mem. op.); *see also Elness Swenson Graham Architects, Inc. v. RLJ II–C Austin Air, LP*, 520 S.W.3d 145, 159 (Tex. App.—Austin 2017, pet. denied) (en banc) ("To preserve error for appeal, the argument made in the trial court must comport with the argument made on appeal.").

As for the Rule 609 argument, that evidence rule applies only when the proponent of a conviction offers it "[f]or the purposes of attacking the credibility of the witness," meaning that if the conviction is offered for another relevant purpose, the trial court does not abuse its discretion by admitting the conviction over a Rule 609 objection. *Murray v. Texas Dep't of Fam. & Protective Servs.*, 294 S.W.3d 360, 369–70 (Tex. App.—Austin 2009, no pet.) (internal quotation and emphasis omitted) (quoting Tex. R. Evid. 609). Here, the Department offered Boyfriend's convictions as evidence of the best interest of Older Son and Younger Son—for example, Boyfriend's convictions are relevant to several of the *Holley* factors used in determining

5

children's best interest like the children's present and future needs and the stability of Mother's home. *See id.* The trial court thus did not abuse its discretion by overruling Mother's Rule 609 objection, and we overrule this evidence-admission issue.

In her next evidence-admission issue, Mother maintains that the trial court should have excluded Boyfriend's adult daughter's testimony. On appeal, Mother argues that the testimony was hearsay within hearsay, speculative, and "prejudicial to the jury" and daughter was not competent to testify to events that occurred when she was 11 years old.

Mother seeks reversal for the trial court's refusal to exclude *all* the daughter's testimony, but Mother's only objection in the trial court that applied to all the daughter's testimony, rather than to just one question-and-answer or another, was to relevance. Mother's relevance objection did not preserve for appeal objections to the entirety of the daughter's testimony that it is hearsay within hearsay, speculative, impermissibly prejudicial, or incompetent. *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1)(A)–(B); *Texas Mut. Ins. Co. v. Durst*, No. 04-07-00862-CV, 2009 WL 490056, at *2 (Tex. App.—San Antonio Feb. 25, 2009, no pet.) (mem. op.) (appellate issue waived because relevance complaint and speculation complaint do not "mirror" each other such that objection to one does not preserve for appeal complaint about the other); *Thomas v. State*, 226 S.W.3d 697, 705 (Tex. App.—Corpus Christi–Edinburg 2007, pet. dism'd) (relevance objection did not preserve hearsay appellate issue); *see also Elness Swenson Graham Architects*, 520 S.W.3d at 159 ("To preserve error for appeal, the argument made in the trial court must comport with the argument made on appeal.").

Mother's appellate brief also does not identify which questions or answers during the daughter's testimony were objectionable on the grounds of hearsay within hearsay, speculation, impermissible prejudice, or incompetence. And the brief does not provide substantive arguments

or citations to authorities or to the record of the daughter's testimony to support this issue. Mother has thus failed to adequately brief this issue, thereby waiving appellate review of it. *See* Tex. R. App. P. 38.1(i); *Hoover v. Guillory*, No. 03-21-00421-CV, 2022 WL 3903124, at *3 (Tex. App.— Austin Aug. 31, 2022, no pet. h.) (mem. op.); *M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *4 n.3 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.).

In a final evidence-admission issue, Mother maintains that the trial court should have excluded Department's exhibit 14, a business-records exhibit of Mother's drug-testing in this case, including records of missed drug tests. Mother's argument on appeal concedes that "the business record appears to satisfy the requirements of a business record affidavit," yet asserts that "*the Department did not show* through its business record affidavit and sponsoring witness that the testing procedures and methodology are sufficiently trustworthy and reliable to be admitted" under Rule of Evidence 803(6). (Emphasis added.)

But the applicable Rule 803(6) burden falls to "the opponent" of a business record "to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Tex. R. Evid. 803(6)(E); *see Lyons v. Deutsche Bank Nat'l Tr. Co.*, No. 05-16-00607-CV, 2017 WL 817143, at *2 (Tex. App.—Dallas Mar. 2, 2017, pet. denied) (mem. op.). Mother's appellate brief makes no showing of how she carried that burden in the trial court, relying instead only on arguing that the *Department* did not present indicia of trustworthiness to the trial court. Further, the sponsoring affidavit here provides information on which the trial court could have exercised its discretion to admit Exhibit 14, including by describing the tests' chain of custody, the instruments used to perform the testing, and the certified or licensed professionals who performed the tests or reviewed the test results. *See F.C. v. Texas*

*Dep't of Fam. & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at \*5–6 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.) (similar items from similar affidavit gave trial court discretion to admit test results). We thus overrule this final evidence-admission issue.[1]

## STATUTORY PREDICATE GROUNDS—ENDANGERMENT

In two of her remaining issues, Mother maintains that the evidence was legally and factually insufficient to support the jury's findings against her under Family Code section 161.001(b)(1)(D) and (E). Subsection (D) applies when a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). Subsection (E) applies when a parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

For these purposes, "'[e]ndanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although '"endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury,'"

---

[1] Mother cites as support *In re K.C.P.*, in which our sister court analyzed an admission of drug-testing results over a Rule 803(6) objection when the objecting attorneys in the trial court identified "qualifications" problems in the proffered business record and with its sponsoring affiant and "the State failed to provide any evidence showing either the types of tests administered or whether they were properly administered." *See* 142 S.W.3d 574, 577–79 (Tex. App.—Texarkana 2004, no pet.). We considered *K.C.P.* in our decision in *F.C. v. Texas Department of Family & Protective Services*, which we apply above. *See* No. 03-19-00625-CV, 2020 WL 101998, at \*5–6 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.).

*id.* (quoting *Boyd*, 727 S.W.2d at 533), or even that the conduct happen in the child's presence, *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at \*4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department."[2] *Id.* "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.*

The relevant inquiry under Subsection (E) is whether the endangerment of the child's well-being was the direct result of a person's conduct, including acts, omissions, or failures to act. *See T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 WL 4692471, at \*6 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.); *In re J.F.-G.*, 612 S.W.3d 373, 382 (Tex. App.—Waco 2020), *aff'd*, 627 S.W.3d 304 (Tex. 2021). If the endangering person is someone other than the parent–appellant, then the parent generally must have known of the other person's endangering conduct. *See* Tex. Fam. Code § 161.001(b)(1)(E); *J.F.-G.*, 612 S.W.3d at 384; *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018), *pet. denied*, 579 S.W.3d 74 (Tex. 2019) (per curiam). "Termination under subsection (E) requires more than a single act or omission, and the Department must show a voluntary, deliberate, and conscious course of conduct by the parent, considering a parent's actions both before and after the child was removed from the home." *T.M.*, 2021 WL 4692471, at \*6.

---

[2] "As a general matter," however, "the relevant time frame" for Subsection (D) review is usually "before the child's removal 'since conditions or surroundings cannot endanger a child unless that child is exposed to them.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)). An exception exists for when the parent "cause[s] his child to be placed in an endangering environment after removal." *Id.* at 749 n.12.

By contrast, the relevant inquiry under Subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at \*4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.*; *see In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."). Because the evidence here under Subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See V.P.*, 2020 WL 544797 at \*4.

The evidence here established several circumstances showing either or both of Subsection (D) and Subsection (E) endangerment. First, the evidence established that Mother knowingly placed Older Son and Younger Son in a home with Boyfriend, when she knew he had a history of endangering conduct. And she was aware this conduct continued in the home. *See T.M.*, 2021 WL 4692471, at \*6 (Subsection (E) endangerment can involve conduct before child's removal from home); *V.P.*, 2020 WL 544797 at \*4 ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)."). Boyfriend's adult daughter testified about his past domestic violence against her mother, Boyfriend's prior partner. His parental rights to her have been terminated, and she testified in this case "to help other children." She described how she had lived with Boyfriend for roughly three years beginning when she was around eight years old. In an incident involving the daughter's mother (several years before this case), Boyfriend, while drunk, got into a physical fight with the mother. She had locked him out of the house, but he broke back

in, pushed her onto a bed, and pressed his forearm onto her throat. The daughter told the jury that this behavior was common for Boyfriend. He would become "very aggressive when he drinks alcohol," often drinking two six-packs before noon, to the point that living with him was "always like walking on eggshells." He can "get really aggressive" just at something a person says, making him generally unpredictable and the daughter afraid to go home when she lived with him.

Around the time of the forearm incident, according to Boyfriend's daughter, Boyfriend also threatened her half-sibling's life. The boy had taken indecent photos of one of Boyfriend's daughters on a tablet device. When Boyfriend found the photos, he told the boy, "to his face," "that he was going to kill him." The boy ran to his room; the daughter went to her room afraid; and Boyfriend told the boy's mother, "You need to get your kid," and "I'm going to kill him."

The daughter relayed still other troubling incidents about Boyfriend. He would sometimes be "aggressive with the babies" in his home (his other children and his then-partner's young children). When one child spilled popcorn on the floor, Boyfriend "shoved [the boy's] face into the ground" and "scream[ed], 'You have to pick it up.'" And he threatened the child with a belt. The daughter also once saw cocaine in Boyfriend's wallet and marijuana in the cabinets of their home. After the daughter stopped living with Boyfriend when she was 11 years old, she went to foster care and needed therapy, had nightmares, and never wanted to live with him again.

The Department also explored Boyfriend's past violent behavior while cross-examining him. He testified that he had been charged with choking his children's mother but that the charge was dismissed because she recanted. He admitted that he had spent time incarcerated in Florida for robbing other drug users. And the trial court admitted the exhibits of Boyfriend's Texas misdemeanors for violating a protective order and terroristic threat.

11

There was evidence that Mother knew about all of Boyfriend's history. He admitted before the jury both that he knows Mother's past "[m]ore than normally one would because of all this came up and we had to go into so much detail and so much into it" and, importantly, that "she knows [his] past pretty well." Older Son feels like Mother has chosen Boyfriend over her own children.

Older Son also had told a school counselor "that he had been threatened with harm" by Boyfriend. Some evidence suggested that Boyfriend had threatened to kill Older Son and that Mother was aware of the threat. Although the Department later "ruled out" the allegation of Boyfriend's threatening Older Son because it could not find evidence to substantiate it, nevertheless and by Mother's admission, Older Son "was afraid to go to sleep due to [Boyfriend] in the house," and his school grades "were slipping and he couldn't focus because he felt unsafe." Boyfriend himself admitted that Older Son is "stressed out about [Boyfriend's] being" in the home and even told the jury that Older Son is "kind of a titty baby when it comes to momma." During this case, Mother broke up with Boyfriend for a short time, but they reconciled and resumed their relationship. Around the time they got back together, the Department removed Boyfriend's children from his care.

Next, both Boyfriend and Mother have illegally used drugs while living together. Around the time of the removal, Mother was drug-tested and admitted that she would test positive for methamphetamine because about two days earlier she had used it with a friend while in the home. Mother at first told the investigator that Boyfriend had recently used methamphetamine as well, including while at the home, but later changed her story to say that Boyfriend had not used. About three months after the removal, Boyfriend took a drug test, and it was positive for methamphetamine. Although he denied that Mother or he used methamphetamine while in the

home with the children, he admitted that they used it while "on the property" when the children lived there. His explanation was that he would use when he was outdoors but not in the children's presence. Mother also admitted to starting to use illegal drugs or abuse prescription drugs when she was 15 years old.

As for drug-testing during the case, Mother thrice tested positive for THC; provided a few "negative diluted" tests[3] and some clean tests; and tested positive for methamphetamine, amphetamine, and marijuana. Ever since that last positive eight months into the case, she has refused all drug-testing required by the court's order, missing in all 66 or so required tests. The jury could reasonably infer from each missed drug test that Mother was continuing to use illegal drugs. *See J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00187-CV, 2022 WL 7163637, at *12 (Tex. App.—Austin Oct. 13, 2022, no pet. h.) (mem. op.); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.). She also admitted to the jury that she occasionally smokes methamphetamine. The children's therapist testified that Mother's and Boyfriend's substance abuse is part of what has created a "history of instability" in the children's home.

Boyfriend has refused any more drug-testing since his positive result during the case. He agreed in his testimony that he is "actively not participating in" the Plan the Department required of him, refusing drug-testing, substance-abuse assessment, individual therapy, and psychological evaluation. His refusal to complete a Plan was the reason Mother gave for breaking up with Boyfriend for a time.

---

[3] This means that her samples were diluted by an abundance of water above normal levels.

Also, Mother failed to undergo individual therapy until successfully discharged by the therapist. But Mother was never successfully discharged by either of the therapists whom she saw and stopped seeing the therapists altogether roughly five months before trial. She also failed to pursue the Plan-required engagement with a sobriety-support group, finding a sobriety sponsor, and a substance-abuse assessment. She told the jury that she does not need the Plan's services.

Aside from the events post-removal in this case, the jury heard evidence of Mother's earlier history with the Department stemming from her drug abuse. Older Son had been removed from her care in 2010 for her abusing Vicodin, including "while supervising" then-four-year-old Older Son, such that she "would sleep all the time and not supervise or care for" him. The Department ultimately returned him to her even though she had refused inpatient drug treatment requested by the Department. Then in 2015, Older Son was again removed from Mother after she was arrested at a traffic stop for possession of a controlled substance, possession of marijuana, resisting arrest, and theft.[4] As a result of the arrest, she surrendered a meth pipe. The Department at the time had reason to believe that there had been domestic violence between Older Son's father and Mother. She successfully got Older Son back after completing Department-requested services, including drug rehabilitation, drug-testing, counseling, parenting classes, and maintaining stable housing and employment, in contrast with this case.

Given all this evidence, we conclude under the legal-sufficiency standards that a reasonable factfinder could have formed a firm belief or conviction both that Mother knowingly placed Older Son and Younger Son in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct, or knowingly placed Older Son and

---

[4] The theft allegation was based on her assisting Older Son's father to sell stolen copper pipe.

Younger Son with a person (Boyfriend) who engaged in conduct, that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *A.C.*, 560 S.W.3d at 630–31. All of the following circumstances, each shown by the evidence, supports the jury's endangerment findings under Subsections (D) and (E): Mother's history with the Department; her history of drug use, her drug use's past effect on her parenting and on instability in the home, and her continuing use during this case even while she was at risk of losing her children; her placing the children in a home with Boyfriend, who had committed domestic violence, threatened another child's life, and made Older Son so afraid that it affected his school grades, all while Mother knew about Boyfriend's history in detail; and her active refusal to participate in her court-ordered Plan. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (use of narcotics and its effect on ability to parent); *T.M.*, 2021 WL 4692471, at *6 (drug use during termination suit, when parent knows of risk of losing the children); *In re L.A.T.*, No. 13-19-00217-CV, 2019 WL 4493702, at *5–6 (Tex. App.—Corpus Christi–Edinburg Sept. 19, 2019, no pet.) (mem. op.) (history with Department); *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.) (failure to complete Department's plan); *Pruitt*, 2010 WL 5463861, at *4 (exposing child to instability); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam) (intentional criminal activity exposes parent to incarceration, thus endangering child's emotional and physical well-being).

Mother raises certain evidence and gaps in the evidence that she believes require reversal. She raises positives about the children's home life with her and with Boyfriend, including that they celebrated birthdays and holidays and that Boyfriend had never physically harmed the children in the home. But proof of endangerment requires no finding that the endangering person actually harmed the children. *See M.C.*, 917 S.W.2d at 269.

15

Mother also raises Boyfriend's and her own denials during their testimony of any domestic violence between them, the therapist's testimony that he knew of no such domestic violence either, and Boyfriend's testimony about his lack of any domestic-violence problems since he left his former partner. The jury was within its rights to disbelieve any of Mother's and Boyfriend's denials and thus give them no weight. *See A.B.*, 437 S.W.3d at 503. And despite the therapist's testimony, no actual injury to the children or to Mother is needed to establish endangerment to the children, *see M.C.*, 917 S.W.2d at 269, but only conduct from which it can be reasonably inferred that the children were exposed to loss or to uncertainty and instability, *see id.*; *Pruitt*, 2010 WL 5463861, at *4. The jury heard that Older Son feels that Mother has chosen Boyfriend over her own children and that Older Son was so frightened of Boyfriend that his grades suffered. From this the jury reasonably could have inferred danger to Older Son's emotional well-being.

Much the same is true for Mother's reliance on her denials about knowing of Boyfriend's past domestic violence. The jury could have disbelieved her denials, and, contrary to her testimony, Boyfriend's testimony was that both members of the relationship knew about each other's pasts in detail, with her knowing his past "pretty well." And although Mother's appellate brief raises what she believes are inconsistencies or holes in Boyfriend's adult daughter's testimony, the jury was within its rights to choose to believe the testimony. *See id.*

Finally, Mother relies on the investigator's testimony that the children seemed to be well cared for and did not show signs of abuse, that Mother did not appear to the investigator to be under the influence of drugs, and that Mother's interactions with Younger Son looked loving and appropriate. And she points out that the investigator did not enter the home to look around before effecting the emergency removal of the children. But these items from the evidence, and

16

the others we have recounted above, are not so significant that the jury could not have formed a firm belief or conviction under Subsections (D) and (E) based on Mother's history with the Department, her history of and continuing drug use and its effects on her parenting and on instability in the home, her placing the children in a home with Boyfriend though knowing about his past, and her active refusal to participate in her court-ordered Plan and its drug-testing requirements. *See A.C.*, 560 S.W.3d at 631. We thus conclude that the evidence was factually sufficient under Subsections (D) and (E) and overrule these two issues.

Because of this conclusion, we need not reach Mother's separate issue by which she challenges the legal and factual sufficiency of the evidence to support the jury's statutory-predicate finding under Subsection (O). Only one predicate-ground finding is needed to support termination, in addition to a best-interest finding. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). We thus proceed to Mother's sole remaining issue. *See* Tex. R. App. P. 47.1; *S.B. v. Texas Dep't of Fam. & Protective Servs.*, __ S.W.3d __, 2022 WL 4242538, at *2 (Tex. App.— Austin Sept. 15, 2022, pet. filed).

## BEST INTEREST

In her last issue, Mother maintains that the evidence was legally and factually insufficient to support the jury's best-interest findings about either child. Deciding "best interest" is "child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. A strong presumption exists that a child's best interests are served by maintaining the parent–child relationship. *D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00323-CV, 2020 WL 7395924, at *5 (Tex. App.—Austin Dec. 17, 2020, pet. denied) (mem. op.); *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

17

To determine whether termination is in a child's best interest, we consider the non-exhaustive factors set out in *Holley v. Adams*: (1) the child's wishes; (2) the child's present and future emotional and physical needs; (3) any emotional and physical danger to the child, now and in the future; (4) the parenting abilities of the person seeking custody; (5) the programs available to assist these individuals in promoting the best interest of the child; (6) the plans for the child by the individual or agency seeking custody; (7) the stability of the proposed home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent–child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *See* 544 S.W.2d 367, 371–72 (Tex. 1976). The Department need not prove all these factors, and the lack of evidence under some factors does not preclude a finding that termination is in the child's best interest, "particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.). Best-interest decisions may take into account endangerment evidence presented to prove the statutory predicate grounds. *See C.H.*, 89 S.W.3d at 28; *V.P.*, 2020 WL 544797, at *8. This is especially true of endangerment evidence involving the parent's illegal-drug use—a "significant" factor to which the factfinder "may give great weight." *S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at *16 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.).

Evidence under the first factor, Older Son's and Younger Son's wishes, weighed in favor of termination. Older Son has expressed his desire not to live with Mother or to ever see Boyfriend again. The caseworker, the children's therapist, and the great-grandfather all testified

18

to this, with the great-grandfather adding that Older Son does not even want any contact with Mother. Older Son wants Mother's parental rights both to him and to Younger Son terminated, the latter so that Younger Son will not have to live the life that Older Son has had to. Younger Son does not like Boyfriend either. Mother has made comments that Older Son is a "lost cause," but she wants to be reunited with Younger Son. Several witnesses testified that Younger Son misses Mother as well, is bonded with her, and wants to see her again, but the jury reasonably could have discounted Younger Son's wish to be with Mother because of the evidence of her endangering conduct; testimony from the caseworker and therapist that Younger Son's wishes are unreliable because of his young age and behavioral difficulties; testimony from the therapist that Younger Son's greatest needs are long-term safety and stability in the home, which the drug use in Mother's home undercuts; and testimony from the CASA representative that Younger Son has also expressed a desire to live in his current placement with his great-uncle and from other witnesses that he is bonded with the great-uncle.[5] *See A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00324-CV, 2021 WL 5911975, at *7 (Tex. App.—Austin Dec. 15, 2021, no pet.) (mem. op.); *T.M.*, 2021 WL 4692471, at *10; *S.C.*, 2020 WL 3892796, at *16.

Under the second, third, fourth, seventh, and eighth factors identified above, the evidence of Mother's endangering conduct is significant, and still other evidence makes these factors weigh in favor of termination. For example, even though Mother knew that failing to comply with her court-ordered Plan may result in losing her children—having been told as much at virtually every hearing she attended and at the early-case conference with the Department—she

---

[5] The great-grandfather illustrated this last point when he testified about an instance of Younger Son's jumping out of a car upon seeing the great-uncle and jumping into his arms because he missed him.

19

still actively refused to engage with her Plan. Older Son knew about this because, as the CASA representative testified, Older Son stopped wanting to be reunited with Mother once he realized that "she's not doing what she needs to be doing" to "get her act together." Also, the children's therapist summed up his view of Mother's care for the children as marked by a "long history of instability," in part because of "people that [Mother]'s dated," the differing parenting styles that those people have brought into the home, and the substance abuse during Boyfriend's time in the home. The therapist added, "[W]hen you are involved in illicit drug use and you are involved in multiple relationships and people coming in and out of the house and influencing the kids, that is a global level of instability that leads to variations in your parenting style," operating in different ways when in different relationships. He even testified to an allegation by Older Son that Mother had given him marijuana and smoked it with him, which Mother both "minimized" and "denied," in the therapist's eyes. Some of Mother's conduct problems coincided with Boyfriend's appearance in her life. According to the great-grandfather, Mother had kept a stable household after Younger Son's father's death, but things deteriorated "soon after she began seeing" Boyfriend, at which point she grew "aloof," falling out of contact with the great-grandparents. Finally, the great-uncle testified that Younger Son was seeing a therapist that the family liked, but Mother "got involved and basically ran [the therapist] off" by bombarding her with calls and texts.

Under the sixth factor, Older Son and the great-grandfather were of one mind in wanting Older Son to live there from now on, and they were supported in that plan by the CASA representative, the therapist, and the caseworker. The great-uncle, who with his wife hold a license to foster children, wants to adopt Younger Son, and it was undisputed that Younger Son is having his physical, developmental, and emotional needs met in that placement. This evidence makes the sixth factor weigh in favor of termination.

20

Mother raises in response on best interest Younger Son's wishes, addressed above; undisputed testimony from Department personnel that Mother would often give Younger Son appropriate care, as when putting him to bed or playing with him; and the lack of any evidence of physical abuse of the children when they lived with her. These matters support Mother's position. But under the legal-sufficiency standards, we conclude that the evidence showing that the children's best interest was that her parental rights be terminated allowed the jury reasonably to form a firm belief or conviction that such findings were true. *See A.C.*, 560 S.W.3d at 630–31. And under factual sufficiency, the evidence Mother raises against the jury's best-interest findings is not so significant that the jury could not have formed a firm belief or conviction that its findings were true. *See id.* at 631. We thus overrule Mother's last issue.

## CONCLUSION

We affirm the trial court's order of termination.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed: November 23, 2022

21